Number 191247 Denise Arruda v. Zurich American Insurance Company. Ms. Kelly, proceed. Good morning. May it please the Court, Kristen Kelly, along with Alan David, on behalf of Zurich American Insurance Company. By way of background, this matter arises out of a car crash that occurred on Route 9 in Hazzy, Massachusetts, on May 22, 2014. For those in the audience not familiar with the case at all, can we say it's a denial of ERISA benefits that happened after the death of the husband and the wife is now the claimant trying to get benefits, and your company denied the benefits on a particular basis? Yes, that is an accurate explanation of the facts before the Court. So the issue before the Court is whether the decision of Zurich to deny policy benefits was arbitrary, capricious, or abuse of discretion in light of the record of a whole. Now, what is arbitrary, capricious, or abuse of discretion? When the Court analyzes the records before Zurich, it's going to be looking at whether there was substantial evidence in the record in order to make the decision that it made. Substantial evidence means plausible, reasonably sufficient to support a conclusion, reasoned. Now, after you review the decision of Zurich and the record before it, you may come, in fact, to a different conclusion than that of Zurich. But it is not the Court's ability to substitute its own judgment for that of Zurich, but rather if it finds that Zurich's decision was supported by substantial evidence. Ms. Kelly, to me, the case raises some difficult questions about the level of certainty to a reasonable medical certainty contained in the physician's opinion which the insurance company relied on to deny benefits. So you relied on an expert who did three things, said, gee, I think his preexisting medical conditions are what caused the man to cross into the wrong lane of traffic and have the car accident. The car accident is what killed him, but his preexisting medical condition contributed to the accident. He says that. And he lists something like seven different factors that come out of the bad medical history of this guy with his heart condition fainting, the like. But then he also says, but I can't tell you to a reasonable medical certainty which of the factors, single or plural, contributed to his driving across to the wrong lane. And then as to the causation issue, he doesn't explain why, despite his statement about, I can't say to a reasonable medical certainty, he doesn't explain why he thinks any of these, is it seven factors? In fact, contributed to what caused the accident. So for me, it's sort of what do we need in terms of certainty of the evidence to be provided to the insurer? Because the claimant has a doctor who picks up on all of these points and says, there is no evidence of contributing to the accident. And he didn't give enough information to permit you to draw that conclusion. Okay? Yes. Thank you for raising the issues. And there's a few points I'd like to make in response. One, you've made it very clear and made a good point about the policy language itself. The policy language itself, both as a covered loss and under the exclusions, both take into account the fact that the crash has to be caused by or contributed to in order for the policy language to come into play. And you've mentioned contributed to many times, and that's an important point to make because it doesn't have to be just caused. It can be contributed to in any way, shape, or form. Now, you've also spoken to the degree of certainty that each one of the medical providers needs to attest to. In the First Circuit and in Massachusetts, there's no specific language that's been adopted by the courts that must be used to qualify a medical opinion, such as a reasonable degree of medical certainty. From our brief, we've cited to many of the cases that have held that it just needs to be helpful to the fact finder to be able to admit medical reports in a trial-level analysis. But here's the problem. It's true that this circuit has not, in ERISA benefit cases, required what you call magic language of reasonable medical certainty. But your expert put into his opinion that he could not say to a reasonable medical certainty if one or more of the factors contributed. Was your expert who used that language and then raises the issue and then draws a sort of summary conclusion without explaining why? If I might just add to Judge Luce's question, Judge Whitlock looks at that and says, it's then simply speculation. Yes, he has a very troubled medical history. He has all of these problems. But to then conclude that this medical history contributed to the accident that then caused his death, in light of what is said by the so-called expert, it's just speculation. And to the extent that your client relied on speculation, that's arbitrary and capricious. I think that's really what Judge Whitlock was saying. So what's wrong with that? Let me complicate it further. Don't you love oral argument? You get a chance to answer our questions. It seems to me there's a line other than speculation. I'm not certain I would say it was speculation. But there is some burden of explanation that comes close to certainty that has been called into question here. After all, you wrote that the policy language, it does say contributed to. It does not say has the potential of contributing to. Okay? So with respect to this expert that we're referencing, I believe you're referencing Dr. Taft, because he was the one that went through the various factors that he believed could have contributed to this crash. He qualifies his opinion with indicating that he reviewed 450 pages of documents, of medical histories, of the reports. Yeah, okay, so he did. But it's his conclusions that we're worried about. Understandably. He does draw those conclusions after reviewing this data, and it's fair to assume that he engaged with that information and therefore drew those conclusions from the data. In addition to Dr. Taft, though, that's not the only opinion that Zerg is relying on. They also have two other medical experts, plus the autopsy report, a toxicology report, a death certificate, EMS and police reports, in addition to evidence submitted by Ms. Arruda. Okay, nice try, but you've evaded the issue of Dr. Taft's opinion, which is the final opinion that your Zerg American relies on. And we've now, two of us have asked you very direct questions about his opinion. Do you have an answer? Beyond Dr. Taft's opinion, frankly, I do not. Your answer is there may be problems with Taft's opinion, but if you look at everything else, that's an adequate basis? Is that your argument? I don't think it's as simplified as that. I think Dr. Taft's report does grapple with the evidence and does draw conclusions based on his review of the evidence, and he may not have those exact parallels that you are specifically looking for, but there are other pieces of the record that, yes, can fill in some of those blanks if you find that Dr. Taft's decision is not as well supported as you would like. No, no, no. What does independent of all other causes mean to you? Are you saying that that means that absolutely none of these other factors come into play? What does it mean? Independently contributing to or causing the crash is not specifically defined in the policy, but independent of these causes, they're specifically listed out in the exclusions, which also are defined under the covered loss, and there's no language here describing what level of contribution. So just looking at the plain language is a pretty low bar. So is it a little bit of contribution or a lot of contribution? I would say it's a pretty low contribution if there's no definition in which to go off of in the policy. It turns out, you guys didn't brief this, but it turns out there's a circuit split on what these terms mean, and some circuits say you have to show really that this other independent cause is substantial, not just any old cause that comes along the way. And as to the contributing to, there also seems to be a circuit split on the degree of certainty that is required here. Is it really your argument that just a low level of independence is all that's required? As you indicated, we have not briefed this issue on the circuit split or other circuits interpretations. I know. It didn't help the court. If you would like supplemental briefs, Your Honor, I would be happy to submit them to the court on that topic. We'll tell you later. Counselor, I guess to some extent this question mirrors Judge Lynch's question about the medical history. You have somewhat the same problem with toxicology with the ingestion of marijuana. Marijuana was found in his bloodstream. They were able to identify the quantity, and then there is this sort of general statement from your expert that, well, that surely impaired him in some way, and hence it contributed to the accident. But then you read on, and then there's an acknowledgment that it's really not possible to tell in what way he was impaired. There's no evidence through the reports that were submitted that this level, this quantity of marijuana would impair in a certain way. So, again, just focusing on Judge Whitlock's decision, he looks at that and says, again, it's just speculation. It's not plausible. It's not reasonably supported to claim that drugs contributed to the accident and to the death. It's the same problem, isn't it, with respect to the toxicology? I don't think those two statements that you've cited, that he was impaired and that you can't specifically identify the exact correlation between impairment and THC levels to be the same thing. There are general statements that, yes, THC has been proven to impair people, and sort of like blood alcohol content. There is no correlation or exact precise language that you can say at a certain BAC level a person will start slurring their words, or an exact time or BAC where something is affecting someone. I think the same holds true with THC where, yes, there are general propositions that marijuana impairs people's driving. That's why there are state laws that have indicated that at a certain level someone is per se impaired. In this case, we have a much higher level than most states have imposed on per se violations of the impairment laws. We cited a few of those in our brief. There are state statutes in multiple states that have set the highest level as five nanograms per milliliter as a per se impairment of THC level. In this case, Mr. I just want to quickly pose the question to you. To some extent, I mean, I get the impression that you're arguing. You referred to the 450 pages that Dr. Taft looked at. It was enormous documentation in this case. Your client posed a lot of questions about it. They did not rush to judgment. To some extent, you seem to be saying that they were, if you just look at the process, that the way in which they went about this decision, you can't characterize as what they did as arbitrary and capricious, so much so that you really, the court really, the district court, we should not be looking behind all of that documentation to make the kind of sort of nuanced judgment about how much was there actually to support what they did. Is that really, are you really relying, in summary, how carefully the process was carried out to argue this was not arbitrary and capricious? May I respond? Oh, yes. We'd like you to. Thank you. It's not just on the process itself. It's all the documents together. We have an autopsy report by an independent medical examiner who's coming to the conclusion that Mr. Arruda died of hypertensive heart disease. We have all of these independent medical reports from Dr. Taft, Dr. Angel, Dr. Bell, who's all coming to the same conclusion. So it's not our business, not the district court, not our business, to actually look closely at what those reports actually say and how they're supported. The court should not be doing that. Is that your position? I don't think it's at that level. The other side has noted a case, the Refoundage case, whereby in that case the reports themselves are facially invalid. There's something in them that to the ordinary layperson the report was just incorrect. In this case, these were facially valid reports, that there seems to be nothing on their face wrong with them. So I think it's reasonable for Zerk to rely on them. Okay. Thank you. You know, we think it would be helpful if we could get briefs from you in two weeks and then from your opponent ten days thereafter, not to exceed 20 pages on the two different issues. One was raised by Judge Stahl, what the term independent means in the coverage clause. And then my questions about what the term contributed to means and the degree of certainty that is required as to each of those language choices. Can you do that? Is that okay? Yes, thank you. Okay. Good morning, Your Honors. Good morning. I'm here to speak for the plaintiff, Capelli, Denise Arruda, and Sarah Burns is here with me today. Unless the Court has a different place it would like me to start, I would like to pick up on where Judge LaPaz ended, which is what does discretion mean? LaPaz. LaPaz. I apologize. I apologize, Your Honor. It's a terrible way to start an argument. I'd like to pick up on the standard of review and what that really means, and can you peer behind the curtain. This Court's recent decision in Lavery v. Restoration Hardware caused me to go back and look at Glenn v. MetLife. And in Glenn v. MetLife the Supreme Court really talked about peering behind the curtain. It talked about the various factors that can form the basis of an abusive discretion, and one of those factors is placing an emphasis on a report that supports a denial of benefits while de-emphasizing a report that doesn't support a denial of benefits. This Court correctly said in Lavery that there is we don't adopt standards because every one of these cases is fact-dependent. But what is clear is that moving behind, looking behind those reports is important in every case because otherwise discretionary review is nothing more than a rubber stamp. So we're not asking you don't stand in the shoes of the administrator, but you do look to see if the decision is reasoned, which brings me, Your Honor, to your question about the level of certainty required. And it may not be as much as skepticism, which Judge Whitlock said, and while I do believe that skepticism, not skepticism, I apologize, but speculation. It might not be as much as speculation, but there has to be you have to prove facts. There has to be some evidentiary support for your position. Okay, but, you know, our language includes the term is it plausible? And you look at this guy's medical history, and you have to say it's quite plausible that his medical conditions were what caused him to drive his car into the lane of ongoing traffic. Whether we have a standard of more than plausibility or whether we should adopt a standard of more than plausibility, we haven't in prior cases had to address that question, but we may have to in this case. I would urge this Court to clarify what plausibility means because there is such a confusion, I guess I would say, in the briefing that we do in the district court level on this issue, what plausibility means. And we've never come, nobody's really come up with a standard that works. And what I will say is that what the courts have done, recently especially, is taken the plausibility standard a little further than what it might imply, what plausibility might imply, which is there needs to be, I keep going back to the standard, there needs to be some evidentiary support. And plausibility implies a lack of evidentiary support to a certain degree. So, you know, this Court said in JET when they cited McKee, the tensor of the case, you were talking about the burdens of proof, but the language there really struck me. It says proof facts that bring the laws within, this was into an exclusionary clause, but it also, it's the same standard that applies to a plaintiff trying to meet their burden of proof. Dr. Taft was asked, directly asked by Sir, did Mr. Arruda's accident, was Mr. Arruda's accident caused, did Mr. Arruda die of an accident independent of all causes? To get to your question, Judge Stahl. And he answered in the affirmative. His exact language was, the deceased died from accidental bodily injury. He then proceeded to list the injuries Mr. Arruda suffered from the accident. He didn't qualify that opinion in any way. In fact, there's only two times in his report that he says, I am making this statement to a degree, a reasonable degree of forensic medical certainty. And that was when he said Mr. Arruda died of an accident independent of all other causes. So what he was basically saying, I think as I read it, was that yes, he had these underlying conditions, but they had nothing to do with causing the accident. Is it my understanding the record has no evidence as to anybody talking about causation? In other words, did he fall asleep? Did he have a heart attack? Not a direct evidence that he had a heart attack. So your answer seems to me to be that absent of all of this, then you're entitled to payment under the policy. Yes, except I take it a step further, Your Honor, because there is actual evidence that shows that Mr. Arruda did not suffer a heart condition or any sort of a heart attack prior to his accident. Well, if we can pardon the expression, I think that's a red herring. I don't think the issue here is whether he suffered a heart attack. I think the issue is whether the heart conditions, which had half a dozen different manifestations, including fainting spells, which led him to have an operation four months earlier, contributed to the cause of the accident. Your Honor, I would say there's a lack of any support to say that they did. It literally is pure speculation. Dr. Tapp offers seven possibilities, and one of them being a low electrolyte level. But we don't know that any of those things caused the accident. Mr. Arruda veered over to the opposite side. He veered from the far right lane into the left lane. He needed to take a left turn, and he hit a car, spun, hit the curb, and flipped three times and died. He was alive at the scene. He was hemorrhaging at the scene. There was blood at the scene. Dr. Lapisada said if his heart had stopped or if there was a natural death, there wouldn't have been blood at the scene. Dr. Tapp, he said there was a natural death. Once again, you're attacking a straw man, which is the heart attack. Could you get back to the other point? Of course, Your Honor. If it wasn't the heart attack, there's a natural death. The question is, was there a natural death? No. Suppose he had a fainting spell, or suppose he had a low pressure brought on by his heart condition that caused him to feel a little woozy, and he crosses the lane. Those are all quite plausible outcomes here. But they're based on supposition. We don't know. And no one has said, there's not one piece of evidence and not one expert that has said has made the causal connection. The policy doesn't say may have contributed to. It said is caused by, is contributed to by, or does result from. It's an affirmative. It requires an affirmative showing. It's not a plausible showing. It's not a supposition. It's not speculation. And there's not one expert in the record that will say that that makes that connection. There's something happened here. People don't just suddenly veer while they're driving into the opposite lane. Something happened here. Now, in light of this very troubled medical history that he has, couldn't one argue that it is a plausible inference that this medical history, whatever the specifics were, that something in that medical history contributed to the accident that caused his death. Why isn't that? And that's clearly what some of the experts are saying. That's why they go into all this detail about his medical history, and they look at that, they look at what happened, and they say, well, no, we can't identify which specific aspect of his medical history accounts for what happened, but something in that medical history did. Why isn't that a plausible inference to draw from the circumstances of the accident and the medical history? Because the policy requires a link. It requires a nexus, Your Honor. And taking your argument to the next level, anyone who has a troubled medical history and gets into an accident, under the plausibility... No, no, no, no, no. That's far too broad. He has a medical history that provides perfectly plausible causation for why he drove his car into the next lane. It doesn't help you to make broad arguments like that. I'd like to ask another question. Judge Stahl has raised a question about the coverage clause and the term independent. I've raised a question about what the contributing to exclusion language refers to. Are those really two separate questions from your point of view? I have argued that they are, Your Honor, and I've argued that there are separate burdens of proof, as this Court has stated in dicta in the past. They're based on the same evidence. But I would start with the fact that my client met her burden of proof by proving that her accident was caused independently of any other means, and that burden of proof was met by Dr. Tao. It's the one thing he says with medical certainty. Dr. Wampasada agrees, again, with medical certainty. Nothing else in the record, the exclusions, are not made with any level of medical certainty. They're specular, and there's no evidentiary support for them. This Court doesn't need to, and I suspect you're heading to the burden of proof, and correct me if I'm wrong, this Court doesn't need to get to the burdens of proof in this case. That was my next question. I know. You're another red herring for my briefing. The only reason I raise it, Your Honor, is because, like the plausibility standard, it would be helpful to have some articulation of what that means. And I pulled up every circuit case and then looked at the district court cases that address this issue, and I couldn't find any good guidance because it's very hard, as Judge Woodlock said, and I recognize, to reconcile the burdens of proof with a visa discretion standard. But the way I would articulate it is the way this Court articulated it in Glenn when relying on McGee from the 10th Circuit. You have to prove facts that make it fall within the exclusion. Prove facts. That's more than plausibility. That's more than speculation. Would you be here making this argument if Zurich had put in some direct evidence that the level of marijuana found in his system was sufficient to make him not a viable driver? In other words, that that level of marijuana would have had a sufficient enough problem that he shouldn't have been behind the wheel and therefore that issue of that exclusion of the policy would come into effect. I would make that argument, Your Honor, if Zurich had not linked it to my client in particular. The argument that Zurich's making about marijuana is general. There's no specific as to your client. Exactly. And that's what this policy requires. It's about my client. It's about what happened in my client's accident. It's not how the presence of THC in someone's blood might affect people generally. It's how did it affect Mr. Arruda. Wouldn't it be enough for an expert to come in and say, look, that level of marijuana, the average person, the average driver would be impaired. And that could have been a cause for this accident. I would think you would have to say, Your Honor, the average person of Mr. Arruda's, you'd have to know his usage, his history of usage, his weight, his body characteristics. That's what the experts say. It's different for every single person. And that's why, in part, I broke this up too because I wasn't sure Massachusetts hasn't adopted a standard as to whether driving while impaired under the influence of THC because it's different for every person. It's one of the states that hasn't gone there yet. There was some speculation, I think, from your side that maybe he was texting and that was what caused him to veer into the other lane. Is there anything about cell phones? We didn't raise that. I believe that came up in the workers' comp hearing, potentially, but it was never proven. The only speculation, I think, from our side is that Dr. Raposada said there was a moment of inattention, distracted driving, which causes a large number of accidents. Given what happened, he veered about 300 to 400 feet in a linear fashion and hit another car. Yes, it's plausible many things could have happened, but there's no evidentiary support for any of them. With your Honor's permission, and I want to get to this before I lose time, if this Court believes this written ID update issue that came up in the District Court opinion in the footnote, Zurich has relied upon it both in their opening brief and their reply brief. We've argued that they've waived this argument. It was never raised down below. If the Court does not believe it's waived, I would like the opportunity to speak to it because there is a statement in the last paragraph of Zurich's brief that is factually inaccurate as it applies to how Mr. Aluta's ICD device works. If that's of concern to the Court or raises any issues, I would appreciate the ability to be heard. You're asking us to make a decision from the bench when we've asked a whole lot of questions that should tell you we haven't yet made a decision. So I will let you have another two pages on your reply brief to address that question, and then your opponent, if they choose to respond, gets two pages within ten days thereafter. Thank you, Your Honor. Okay. If there are no further questions, Your Honors. Thank you. No time. Thank you. That's a difficult case. Thank you.